UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RANDY MCCAA,

                Plaintiff,

v.

DR. KIMBERLY MCKOWN,
DR. AMY ZIRBEL,
DR. TODD HAMILTON,
LT. MICHAEL HELMEID,
C.O. JOHN DIEDRICK,
CAPTAIN RYAN BAUMANN,
SGT. BENJAMIN WERNER,
C.O. MICHAEL FUGATE,
C.O. SAMANTHA WILLIAMS,
C.O. SARAH HAUSCHULTZ,
C.O. JARED FRANKE, and C.O.
RALPH MAKI,

                Defendants.

Case No. 16-CV-175-JPS

ORDER

**1.**     **INTRODUCTION**

On November 1, 2016, the deadline for filing dispositive motions in this matter, the defendants filed a motion for summary judgment as to all of the plaintiff Randy McCaa's ("McCaa") claims. (Docket #31 at 3 and #60). On November 22, 2016, McCaa filed his own motion for summary judgment, a brief in support of forty-seven pages, and proposed findings of facts numbering over three-hundred paragraphs. (Docket #66, #67, and #68). McCaa also filed a response to the defendants' statement of facts, but failed to cite any evidence when attempting to dispute any facts, at best stating "dispute" and making a reference to "plaintiff['s] brief." (Docket #71).

McCaa has been informed of the requirements of the Federal and Local Rules regarding summary judgment at least twice; by attachments to the Court's trial scheduling order, and by the defendants' own summary judgment motion. (Docket #31 and #60).[1] He has chosen to ignore those rules by filing a summary judgment motion well beyond the deadline set by the Court, greatly exceeding the page limitation on briefs, including over double the maximum allotment of statements of fact, and failing to cite any evidence in support of his disputes of fact. These infirmities cannot be overlooked.

As to McCaa's putative summary judgment motion, it must be rejected outright as being filed beyond the deadline and without seeking the Court's leave. His response to the defendants' statement of facts must also be ignored. Though the Court is required to liberally construe a *pro se* plaintiff's filings, it cannot act as his lawyer; the Court cannot and will not delve through all of McCaa's submissions in this case to find the evidence that appropriately supports each attempted dispute. Indeed:

> A district court is not required to "wade through improper denials and legal argument in search of a genuinely disputed fact." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). And a mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material. *Edward E. Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 196 (7th Cir. 1993). In short, "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Smith's summary-judgment materials were woefully deficient in either responding adequately to the defendants' statement or in setting forth additional facts with appropriate citations to the record. As such, Smith's purportedly good intentions aside,

---

[1] McCaa seems to be well aware of the Federal Rules of Civil Procedure generally, including Rule 56, as he cites them repeatedly in his legal brief.

> the district court did not abuse its discretion in deeming admitted and only considering the defendants' statement of material facts.

*Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). This Court would offer a similar analogy: it is not an archaeologist, made to sift through McCaa's filings hoping to piece together clues to the evidence behind his legal positions.

Like *Smith*, no matter McCaa's intentions, his utter failure to comply with the rules of procedure means that the Court has no choice but to disregard entirely most of his summary judgment filings. It will deem the defendants' facts undisputed for purposes of deciding the motion. However, the Court will generously review McCaa's brief itself, despite it being substantially overlong, and consider legal argument contained therein.[2] With this framework, the Court will address each of McCaa's claims in turn.

---

[2]On December 12, 2016, McCaa filed a "Reply Brief in Support of Plaintiff's Motion in Opposition to Deny Defendant[s'] Summary Judgment Motion[.]" (Docket #79). First, as to its substantive argument, the document will be ignored. Briefing on the only viable motion, the defendants', is closed. Second, McCaa claims that he did not intend to move for summary judgment himself. *Id.* at 1-2. Regardless of his alleged confusion, McCaa's motion seeks judgment against the defendants, and therefore operates as a request for summary judgment. As noted above, the request came too late and must be summarily denied.

Finally, McCaa states that his non-compliance with the above-cited procedural rules was unintentional. *Id.* at 2. Civil Local Rule 56(b) could not be clearer as to precisely what is required to oppose summary judgment. *See* Civil L. R. 56(b)(2). His summary judgment filings evince an outright refusal to even read Local Rule 56(b); in fact, the instant document states that he simply attempted to mirror the defendants' filings. (Docket #79 at 2). Given the quality of McCaa's brief and his other filings in this case, and his ability to marshal rules and caselaw in support of his arguments, the Court cannot excuse his failure to comply with them here.

## 2. ANALYSIS

McCaa was permitted to proceed on five claims of deliberate indifference under the Eighth Amendment. (Docket #53 at 2-3). Four are related to his self-harming behavior on various dates from December 2013 to August 2015. *Id.* The remaining claim is for failing to obtain medical assistance for him after a particular self-harming incident in May 2014. *Id.* at 2. The defendants seek summary judgment as to each of these claims. (Docket #60).

To state a claim for a violation of constitutional rights pursuant to 42 U.S.C. § 1983, a plaintiff must prove that: 1) he was deprived of a right secured by the Constitution or laws of the United States; and 2) the deprivation was visited upon him by a person or persons acting under color of state law. *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) (citing *Kramer v. Village of North Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004)); *see also Gomez v. Toledo*, 446 U.S. 635, 640 (1980). The defendants do not dispute that they acted on the color of state law.

They do, however, argue that they were not deliberately indifferent to McCaa's self-harming activities or his medical needs, and thus that their conduct did not violate his Eighth Amendment rights. To show deliberate indifference, a plaintiff must prove that "(1) [she] had an objectively serious medical condition; (2) the defendants knew of the condition and were deliberately indifferent to treating her; and (3) this indifference caused her some injury." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

With respect to self-harming or suicidal behavior, the Court of Appeals holds that suicide satisfies the "serious medical condition" element.

*Pittman ex rel. Hamilton v. Cnty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014). The *Collins* court provides further relevant instruction:

> Where the harm at issue is a suicide or attempted suicide, the second, subjective component of an Eighth Amendment claim requires a dual showing that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk. [*Matos ex. rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003)]; *see also Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000) (defendant must be aware of the significant likelihood that an inmate may imminently seek to take his own life and must fail to take reasonable steps to prevent the inmate from performing the act).
>
> With respect to the first showing, "it is not enough that there was a danger of which a prison official *should have been* aware," rather, "the official must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Estate of Novack*, 226 F.3d at 529 (emphasis added). In other words, the defendant must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life. *Id.*; [*Sanville v. McCaughtry*, 266 F.3d 724, 737 (7th Cir. 2001)] (issue is whether the defendant was subjectively "aware of the substantial risk that [the deceased prisoner] might take his own life"). Liability cannot attach where "the defendants simply were not alerted to the likelihood that [the prisoner] was a genuine suicide risk." *Boncher ex rel. Boncher v. Brown County*, 272 F.3d 484, 488 (7th Cir. 2001).
>
> . . .
>
> [As to the second showing], [d]eliberate indifference requires a showing of "more than mere or gross negligence, but less than the purposeful or knowing infliction of harm." *Matos*, 335 F.3d at 557; *Estate of Novack*, 226 F.3d at 529. We have characterized the required showing as "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks." *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992). To establish deliberate indifference, a plaintiff must present evidence that an individual defendant intentionally

disregarded the known risk to inmate health or safety. *Matos*, 335 F.3d at 557. A defendant with knowledge of a risk need not "take perfect action or even reasonable action[,] ... his action must be reckless before § 1983 liability can be found." *Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003).

. . .

[In sum,] [t]he deliberate indifference standard imposes a "high hurdle" for a plaintiff to overcome.

*Collins v. Seeman*, 462 F.3d 757, 761-62 (7th Cir. 2006). As shown below, with respect to each alleged incident of deliberate indifference, McCaa cannot overcome this hurdle.

### 2.1 December 11, 2013[3]

On December 11, 2013, Dr. Kimberly McKown ("McKown") was conducting routine wellness checks for prisoners on "observation status." "Observation status" is used, *inter alia*, to help protect suicidal prisoners from themselves, and involves regular meetings with medical professionals and near-constant staff observation. McKown contacted McCaa that morning. She observed him masturbating and told him to stop, which he did. McCaa complained to McKown about the mental health treatment he was receiving at the institution and reported that it was causing him to have suicidal thoughts. McCaa stated he had been thinking about cutting himself but denied any immediate plan to do so. He also stated he had nothing in his cell he could use to cut himself with.

McKown discussed the future with McCaa, including his plans to operate a business after his release from prison. McKown offered to get McCaa a book to help him cope while waiting to be seen by a primary

---

[3]The Court draws the below-described facts from the defendants' statement of facts, (Docket #62), in accordance with its ruling above.

clinician. McCaa stated he was unsure if he wanted a book because of his low reading level, and McKown stated she would attempt to find something easy for him to read. Later that day, another doctor saw McCaa after he was reportedly scratching his arm, causing minor cuts and bleeding. She ordered that he be placed in mechanical restraints for the rest of the day to stop that behavior.

These facts defeat both of the *Collins* showings. First, not only was McKown not aware of a risk that McCaa would hurt himself, he specifically disclaimed an immediate intent to do so or possession of any tool to facilitate that behavior. Second, McKown's discussion with McCaa showed concern for his mental state falling well below recklessly disregarding his safety. McCaa claims that McKown should have placed him in restraints immediately, but at the time she saw him, he had not harmed himself and stated that he had no imminent desire to do so. That the other doctor placed him in restraints *after* she observed self-harming activity has no bearing on whether McKown's actions were appropriate. McKown's innocent conversation with McCaa cannot support a finding of deliberate indifference.[4]

### 2.2 May 30, 2014

Two of McCaa's claims arose from the incidents of this date, but they are so intertwined that the Court will address both collectively. On May 30, 2014, McCaa was again on observation status, and Dr. Amy Zirbel ("Zirbel") was conducting psychological rounds in McCaa's housing unit. She looked in on McCaa and saw that he was sleeping, so she began talking to another

---

[4] This finding obviates the need to delve into the parties' dispute on whether McCaa exhausted his administrative remedies as to the McKown incident.

Page 7 of 19

Case 2:16-cv-00175-JPS   Filed 12/15/16   Page 7 of 19   Document 80

inmate down the hall. McCaa then awoke and started yelling at Zirbel, who responded that Dr. Todd Hamilton ("Hamilton") would be conducting McCaa's observation check for the day.

Later that day, McCaa became angry that he would be subject to disciplinary hearings, despite being on observations status. This was apparently directed at prison security staff including Lt. Michael Helmeid ("Helmeid"). McCaa began using his fingernails to scratch his left arm, and later correctional officer John Diedrick ("Diedrick") saw McCaa making cutting motions on his arm. Neither Diedrick nor anyone else observed any blood. In the afternoon, Health Services Unit ("HSU") staff asked McCaa if he needed assistance, but he rejected their care.

About an hour later, Hamilton made contact with McCaa to conduct his observation check. When Hamilton asked McCaa a question, McCaa simply responded that "[a]ll fuckin' with me." McCaa eventually stopped scratching his arm and placed his mat in front of his door, ending his conversation with Hamilton. Hamilton kept McCaa on observation status.

McCaa continually rejected HSU help for the next four days. On June 5, 2014, McCaa complained to HSU staff about hip pain and he also claimed that he cut himself on May 30, 2014, and that he wanted to document that he did not get any medical care at the time. In that meeting, the HSU nurse noted McCaa had an old laceration on his left arm that had healed well.

For this date, McCaa claims that Zirbel, Hamilton, Helmeid, and Diedrick were deliberately indifferent to his suicidal actions, and that Hamilton, Helmeid, and Diedrick were deliberately indifferent to his need for medical care after cutting his arm. Both claims fail because McCaa did not present a serious medical need to these defendants. Though suicide is

undoubtedly such a need, McCaa's actions were nowhere near suicidal. He scratched his arm with his fingernails without drawing blood, and declined medical assistance that day and for the next four days. Even when he saw HSU on June 5, McCaa did not actually have an immediate medical issue relating to the scratching incident, but merely wanted to "document" the incident. The fact that McCaa was generally having suicidal ideation does not mean that *any* attempt to harm himself automatically creates a serious medical need; he was on observation status for the very reason of detecting legitimate suicide attempts. Thus, the Court cannot say that these defendants were presented with facts showing a genuine suicide risk and that they actually believed the risk existed. *See Collins*, 462 F.3d at 761.

### 2.3 August 5, 2014

On August 5, 2014, while off of observations status, Zirbel observed McCaa masturbating while looking at her. She told security staff and continued her rounds. Later, McCaa stopped Zirbel to complain about his medications being discontinued. She told him that he needed to discuss that issue with his primary clinician or that he could submit an HSU request form. Zirbel closed the conversation by informing McCaa that, because of his earlier inappropriate sexual behavior, she would not talk to him for the rest of the day.

Security staff later told Zirbel that McCaa reported feeling suicidal, and that he said he needed to be placed on observation status because he lacked medications and Zirbel had refused to provide them. McCaa had also covered the window to his cell so that staff could not see in. Zirbel declined to place McCaa on observation status, and explained her decision in a report:

> MENTAL STATUS
>
> Mr. McCaa appeared alert and oriented. Speech was normal. There were no signs of psychosis. He did not appear to be in significant distress. He endorsed suicidal ideation; however, he often reports chronic thoughts of harming himself without intent or plans. His thoughts were coherent and organized. His affect appeared calm and euthymic.
>
> IMPRESSIONS
>
> Mr. McCaa had been observed masturbating while looking at this clinician earlier in the day and while I was speaking with him after this incident, it appeared he was trying to engage in a conversation to keep this clinician at his door. It is unknown if he continued to engage in the inappropriate behavior; however, I left his door due to his inappropriateness. He was not placed into observation at this time. Mr. McCaa has a history of exposing himself and masturbating in front of female staff. During the past week, he was removed from the Cage Your Rage group due to masturbating during group. His issues during the morning did not appear to be mental health related but in my opinion, were his attempt at getting attention from a female staff member. Mr. McCaa has a history of lengthy observation placements and during these placements, he does not appear to be in distress as he is observed eating regularly, cooperating with staff, talking animatedly with other inmates, and he does not exhibit symptoms of serious mental illness. His previous placements in observation appear to often be motivated by secondary gain attempts. He does not have a history of lethal or serious self-harm behaviors. Based on this history, he was not placed in observation.

(Docket #64-1 at 8).

As before, Zirbel was not deliberately indifferent here because she had no basis to conclude that McCaa's actions created a genuine suicide risk. Zirbel's only interactions with McCaa were the masturbation incident, his complaints about his medication, and the report that he was suicidal. She was

not presented with an actual attempt at self-harm or any evidence that one was imminent. Further, Zirbel passes the subjective element of the knowledge standard. Her report shows that she did not believe that McCaa was a real risk of serious self-harm, but instead engaged in the behavior for attention.

The day's events did not end there, however. McCaa refused to uncover his window for most of the day. That evening, Helmeid and other officers entered the cell and removed McCaa. He was strip searched and placed on "control status," which is a punitive measure that may be used for prisoners who refuse to obey orders. Helmeid consulted with the on-call clinician in deciding whether to place McCaa on control or observation status, and they agreed that at that time, observation was unnecessary.

McCaa was monitored every half-hour. He eventually told Helmeid that he had a paperclip to cut himself with, but McCaa had again covered his window, obscuring Helmeid's view. After again consulting with the on-call clinician, the clinician directed that McCaa be placed on observation status. Another forceful cell extraction, including use of mace, was required to gain McCaa's compliance and remove his window covering. Afterwards, McCaa was allowed to shower. He also saw a nurse, who observed a three-inch incision in his upper arm which was not bleeding. McCaa appeared relaxed and comfortable while she cleaned and dressed the wound.

McCaa was not taken to observation, but was instead put back on control status and monitored every thirty minutes. Early on the morning of August 6, 2014, Helmeid was notified again that McCaa was covering his window and had showed staff a piece of metal. Helmeid decided not to do another extraction at the time but instead continued monitoring and

communicating with McCaa. When the clinician arrived, she noted that there must have been a miscommunication between her and Helmeid regarding McCaa's observation placement. She met with McCaa and noted that he was not currently engaging in self-harming behavior. Nevertheless, McCaa was extracted from the cell (not by Helmeid; he was no longer on duty) and the clinician approved placing him in restraints for a number of hours.

The clinician recorded the reasons for her decision to place McCaa on observation. She stated that "Mr. McCaa's history is rife with his observation placements reflecting his upset [sic] with staff and attempts at secondary gain rather than being actively suicidal. This again seems to be the case, however, given his recent cutting, it is suggested he be observed for a brief period to be certain of his mental status. If he continues to appear as though this was primarily an attempt at gaining control or manipulation he may be removed." *Id.* at 12. McCaa was ultimately placed in observation status, and was released on August 9, 2014. With regard to a later self-harming incident not subject to this lawsuit, the clinician further noted that McCaa's behavior was wholly a behavioral and security issue. *Id.* at 13.

Helmeid's actions do not evince deliberate indifference. He consulted with the clinician each time he observed a need to change McCaa's status. At the first incident, the clinician approved control status. As to the second, Helmeid admittedly failed to follow the clinician's instructions due to a miscommunication. At best, this might be evidence of negligence, but the miscommunication alone does not establish intentionality or criminal recklessness. Rather, the remainder of Helmeid's conduct shows the opposite. He regularly monitored McCaa and, when McCaa was extracted from his cell the second time, allowed him to receive appropriate medical

treatment. As later noted by the clinician, McCaa's disruptive behavior was directed more at gaining attention and other benefits rather than being a result of a true mental disturbance. Helmeid's actions, as a whole, fall far short of "something approaching a total unconcern for [the prisoner's] welfare[.]" *Collins*, 462 F.3d at 762 (quotation omitted).

### 2.4 August 22 and 23, 2015

On August 22, 2015, McCaa was disciplined multiple times for masturbation and general disturbance. He was eventually extracted from his cell that evening. McCaa sustained minor cuts to his elbow and eyebrow during the cell extraction. He was transported to the restrictive housing unit where he was strip searched and attended to by a nurse. Thereafter, in response to McCaa's threats to cut himself with scissors, McCaa was placed on observation status.

McCaa refused to go through the outer vestibule of the observation cell to enter the inner portion of the cell (so he could be locked within), and put a security mat in the inner cell door to prevent it from being electronically locked. Captain Ryan Baumann ("Baumann"), who had overseen the extraction, believed McCaa was upset about the extraction. Baumann decided that since McCaa was secure inside the outer vestibule of the observation cell, and because he had already been searched, he could be left where he was.

McCaa continued to act disruptively into the night. Another officer informed Baumann that McCaa had a small disk in his hand. Baumann knew that McCaa was not allowed to have the item, but McCaa was not harming himself or threatening to do so at the time. Baumann had known McCaa for several years and had seen this behavior before, specifically that McCaa

would intermittently show staff small pieces of contraband to keep them engaged with him. Since there was no immediate threat, Baumann told the officer to make sure McCaa was monitored and to notify Baumann if the situation changed. The officer's shift ended at 10:00 p.m., at which time he notified Baumann that McCaa had entered his inner cell and calmed down some, but that he still had the disk.

Sgt. Benjamin Werner ("Werner") and correctional officers Michael Fugate ("Fugate"), Sarah Hauschultz ("Hauschultz"), and Jared Franke ("Franke") were on-duty that night with Baumann. While checking in on McCaa, Fugate noticed McCaa was stuffing toilet paper in his nostrils around 11:30 p.m., which inmates often do to prevent incapacitating agents from getting into their lungs. McCaa then went to the back of his cell and refused to respond to commands. Fugate had Hauschultz attempt to talk to McCaa because McCaa usually responded to female officers, but this was apparently of no help. Fugate notified Baumann of the situation around 11:55 p.m.

Baumann arrived a few minutes later and described the cell as "set up in a manner to look as if McCaa had hung himself. . . . [H]e wasn't actually hanging, but seemed to want us to believe he was." (Docket #63-4 at 30). McCaa was lying on the floor with a piece of linen wrapped around his neck and tied to the bed of the observation cell. Baumann could see the rise and fall of McCaa's chest and he could also see that McCaa was lying on his back, which indicated to Baumann that McCaa's airway was not obstructed because any pressure from the linen would have been on the back of McCaa's neck. McCaa also used his security mat to partially block the view into the cell. Baumann eventually spoke with McCaa but McCaa refused to be restrained; Baumann ultimately decided to conduct another extraction.

Page 14 of 19

Case 2:16-cv-00175-JPS   Filed 12/15/16   Page 14 of 19   Document 80

The cell extraction team consisted of Fugate, Werner, Hauschultz, and correctional officer Samantha Williams ("Williams"). Upon seeing the extraction team, McCaa's demeanor changed from "somewhat slow and disoriented to assertive." *Id.* at 31. After continuing to refuse compliance, McCaa was sprayed with mace. After a few minutes, he agreed to be restrained. McCaa was strip searched, and no contraband was found.

McCaa was taken to another cell to shower, but as soon as he was tethered to that cell's door, he threatened to cut himself. Baumann asked what McCaa would use to cut himself with, and McCaa answered, "[y]ou'll see, as soon as I get in there, you'll see." *Id.* McCaa requested medical attention due to a small cut on his arm but Captain Baumann informed McCaa that no nurse was present at the time. McCaa then demanded to be tied down, but Baumann responded that restraints could be avoided by McCaa's simply surrendering whatever item he had. Baumann instructed the team to conduct another strip search, but McCaa refused to comply with the search.

McCaa stated that he would not permit the search until he could shower. Baumann noted that McCaa would likely use that as an opportunity to hide whatever he was carrying. He then contacted the on-call clinician about placing McCaa in restraints, but they agreed that restraints were not necessary.

Because the assembled team could not remain with McCaa throughout the night, Baumann instructed Fugate to watch McCaa. Baumann returned shortly thereafter to find McCaa continuing to refuse to complete the strip search and starting to make a small cut on his arm, which caused minor

bleeding. McCaa stated he was using his finger nail to make the cut. Baumann spoke with McCaa, who

> began to brag that he'd sued the state three times, and hoped to get another lawsuit [out] of this incident. His statements, and the additional conversations throughout the night demonstrated to me that he was in a sound mind set, was forward thinking, and his actions seemed to be driven more by a desire to get staff to make mistakes (for litigation purposes) than to actually harm himself.

*Id.* at 32. Baumann left again to complete his other duties. He instructed his staff to monitor McCaa regularly, increasing the frequency of checks from every fifteen minutes to every five minutes.

Baumann continued to call in to check on the situation until 5:00 a.m., when his shift ended. Fugate and correctional officer Ralph Maki ("Maki") stayed with McCaa, and reported that he remained steadfast in his refusal to be searched, and also continued to cut his arm, though it was less than an eighth of an inch deep. They could not tell if McCaa was using his fingernail or a small object, but if it was an object, it was small enough to fit under his fingernail. Baumann determined that based on this information, as well as the officers' reporting that McCaa was calm, that the threat to McCaa's safety was low. Baumann called the nurse to notify her of the situation, but she was unable to see McCaa until after the strip search was completed. When the new shift took over, McCaa gave them a quarter-inch piece of metal he was carrying and permitted them to complete the search. McCaa's forearm wound was closed without stitches.

It is clear that Baumann controlled the events of August 22 and 23, and the other officers merely took his direction. Thus, the real source of deliberate indifference, if any, is Baumann. Further, there is no evidence that

any of the officers failed to respond appropriately to the events in which they took part. They checked on McCaa as required due to his observation status and reported their observations to Baumann. The officers' actions do not rise to the level of criminal recklessness in the face of McCaa's behavior.

As to Baumann, like others before him, he believed that McCaa's disruptive activity was a plea for attention, and possibly meant to stage the instant litigation, rather than a real threat of suicide. Specifically, he never believed that McCaa would seriously injure himself. This defeats the subjective knowledge element of deliberate indifference; Baumann was never "cognizant of the significant likelihood that [McCaa] may imminently seek to take his own life." *Collins*, 462 F.3d at 761. Further, Baumann's actions were far from indifferent to McCaa's needs. He placed McCaa on near-constant observation for most of the night and early morning. Even if one could claim that Baumann should have done more to intervene earlier in the search/shower incident on the morning of August 23, that is not the relevant question. Baumann was not required to "take perfect action or even reasonable action, even assuming he was aware of the suicide risk; his action must be reckless before § 1983 liability can be found." *Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003). Baumann showed concern for McCaa's welfare and balanced that against the safety of his officers which may be jeopardized by continuing to confront McCaa physically. No reasonable jury could conclude that Baumann was anything close to criminally reckless as to McCaa's safety.

### 2.5 McCaa's Latest Motion for Appointment of Counsel

The Court closes by addressing McCaa's fourth motion for appointment of counsel, styled as a "renewed" motion. (Docket #76). This

latest motion cites only three reasons in support: 1) McCaa has difficulty contacting witnesses who are no longer incarcerated, 2) he cannot present a case at trial without a lawyer, and 3) he feels his case is "worthy for a jury to consider." *Id.* The motion must be denied. First, as stated in its orders on McCaa's second and third motions for appointment of counsel, McCaa has been ably litigating this matter since its inception. *See* (Docket #26 and #53). Other than his procedural failings noted above, McCaa's summary judgment filings show that he can understand the relevant evidence and present cogent arguments. *See* (Docket #66, #67, #68, #71, and #74). Second, McCaa's statements in the latest motion would only be relevant if this case were proceeding to trial, but it is not.

### 3. CONCLUSION

On the undisputed facts before the Court, no reasonable jury could conclude that any of the defendants was deliberately indifferent to McCaa's safety or medical needs. The defendants are, therefore, entitled to summary judgment on each of McCaa's claims.

Accordingly,

**IT IS ORDERED** that the defendants' motion for summary judgment (Docket #60) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the plaintiff's motion for summary judgment (Docket #66) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the plaintiff's motion for appointment of counsel (Docket #76) be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 15th day of December, 2016.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge