# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

RANDY MCCAA,

                      Plaintiff,

v.

DR. TODD HAMILTON, DR. KIMBERLY MCKOWAN, DR. AMY ZIRBEL, CAPTAIN RYAN BAUMANN, LT. MICHAEL HELMEID, C.O. JOHN DIEDRICK, SGT. BENJAMIN WERNER, C.O. MICHAEL FUGATE, C.O. SAMANTHA WILLIAMS, C.O. SARAH HAUSCHULTZ, C.O. JARED FRANKE, and C.O. RALPH MAKI,

                      Defendants.

Case No. 16-CV-175-JPS

**ORDER**

      In this action, Plaintiff alleges that Defendants were deliberately indifferent to his risk of suicide on a number of occasions spanning from December 2013 to August 2015. (Docket #54). Plaintiff filed motions for appointment of counsel on four occasions, and each was denied. (Docket #5, #23, #48, and #76). On December 15, 2016, the Court granted summary judgment to Defendants in part based on Plaintiff's failure to comply with the rules of procedure applicable at the summary judgment stage. (Docket #80).

      Plaintiff filed a notice of appeal on December 21, 2016. (Docket #82). His *pro se* materials offered a number of grounds for appeal but, after being appointed counsel by the Court of Appeals, he pursued only one: that this Court erred in denying his motions for appointment of counsel. More than

a year-and-a-half later, on July 24, 2018, the Court of Appeals issued its opinion on the matter. (Docket #95). It found that this Court had not adequately addressed Plaintiff's final two motions for appointed counsel. *Id.* It reversed the judgment in favor of Defendants and remanded for further proceedings. *Id.*

Upon receipt of the Court of Appeals' mandate, this Court directed that Plaintiff file a new motion addressing all of the argument and evidence he wished to offer in favor of the appointment of counsel. (Docket #96). In accordance with the Court's order, Plaintiff filed his fifth motion for appointment of counsel on August 8, 2018. (Docket #97). That motion is now fully briefed. (Response, Docket #100; Reply, Docket #105). For the reasons explained below, Plaintiff's motion will be denied.

As a civil litigant, Plaintiff has "neither a constitutional nor statutory right to a court-appointed attorney." *James v. Eli*, 889 F.3d 320, 326 (7th Cir. 2018). However, under 28 U.S.C. § 1915(e)(1), the "court may request an attorney to represent any person unable to afford counsel." The court should seek counsel to represent a plaintiff if: (1) he has made reasonable attempts to secure counsel; and (2) "'the difficulty of the case—factually and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it.'" *Navejar v. Iyiola*, 718 F.3d 692, 696 (7th Cir. 2013) (quoting *Pruitt v. Mote*, 503 F.3d 647, 655 (7th Cir. 2007) (en banc)). Whether to appoint counsel in a particular case is left to the court's discretion. *James*, 889 F.3d at 326; *McCaa v. Hamilton*, 893 F.3d 1027, 1031 (7th Cir. 2018).

While framed in terms of the plaintiff's capacity to litigate, this discretion must also be informed by the realities of recruiting counsel in this District. When the Court recruits a lawyer to represent a *pro se* party, the

lawyer takes the case *pro bono*. Unlike a lawyer appointed to represent a criminal defendant during his prosecution, who is paid by the government for his work, an attorney who takes a prisoner's civil case *pro bono* has no expectation, much less any promise of compensation.

Thus, it comes as no surprise that is incredibly difficult to convince local lawyers to take such cases. *Wilborn v. Ealey*, 881 F.3d 998, 1008 (7th Cir. 2018) (observing that district courts "must rely on the generosity of lawyers to volunteer their time and skill on behalf of indigent civil parties"). Unlike other districts in this Circuit, *see, e.g.*, L. R. 83.35 (N.D. Ill.), the Eastern District of Wisconsin does not employ an involuntary appointment system for lawyers admitted to practice here. Instead, the District relies on the willingness of lawyers to sign up for the Pro Bono Attorney Panel and, once there, accept appointments as needed. *See* Pro Bono Program, *available at*: http://www.wied.uscourts.gov/pro-bono-fund.

To be sure, the District is eternally grateful to the lawyers who participate in the Pro Bono Program; however, there are never enough volunteers, and those who do volunteer rarely take more than one or two cases a year. This is understandable, as many are already engaged with representation of fee-paying clients. Though the Pro Bono Program does provide for payment of certain litigation expenses, it does not directly compensate a lawyer for his or her time. Participants may seek attorney's fees when permitted by statute, such as in successful Section 1983 cases, but they will otherwise go unpaid. The small pool of attorneys available to this District for *pro bono* appointments stands in stark contrast to that of the Court of Appeals, which regularly recruits counsel from across the nation to represent *pro se* plaintiffs on appeal. *See, e.g.*, *James*, 889 F.3d at 323

(appointing counsel from Washington, D.C. to represent the *pro se* appellant); *McCaa*, 893 F.3d at 1029 (same).

Against the thin ranks of ready and willing counsel rises the overwhelming tide of *pro se* prisoner litigation in this District.[1] In 2010, approximately 300 civil actions were filed by prisoner litigants. More than half sought habeas corpus relief, while the remainder were Section 1983 actions alleging violations of constitutional rights. Since then, the number of habeas corpus cases has remained largely steady at around 130 per year, while the volume of Section 1983 prisoner lawsuits has skyrocketed. Some 300 Section 1983 actions were filed in 2014, and another 300 in 2015—each equal to the entirety of the District's civil prisoner filings from just four years earlier. In 2016, Section 1983 actions numbered 385, and in 2017 it ballooned to 498. In 2018, the Court received a staggering 549 prisoner cases. All told, well over a third of the District's new case filings are submitted by unrepresented inmates. On its best day, this District has the resources to realistically consider appointment of counsel in only a tiny fraction of these cases.

---

[1] Although non-prisoner *pro se* litigants may also be considered for the appointment of counsel under Section 1915, the Court does not address that set of *pro se* litigants here for a few reasons. First, the volume of non-prisoner *pro se* litigation is miniscule compared to that brought by prisoners. Second, prisoners are much more likely to request the appointment of counsel. Paradoxically, prisoners are usually far better equipped to litigate than non-prisoners, as prisoners have access to electronic filing, institution law libraries, and fellow prisoners who offer services as "jailhouse lawyers." In fact, learning a little of the legal system means that prisoners know they can request the appointment of *pro bono* counsel, which they do with regularity. Non-prisoner *pro se* litigants are rarely aware of this option.

Moreover, hard data supports the conclusion that these prisoner suits are most often without merit. Since 1988, prisoners have generally lost about 85% of the cases they have filed. Margo Schlanger, *Trends in Prisoner Litigation, as the PLRA Enters Adulthood*, 5 U.C. Irvine L. Rev. 153, 164 (2015). Only about 5% of prisoner suits ultimately result in some form of settlement, while during the period 2002–2012, less than 2% made it to trial. *Id.* It is unsurprising, then, that local attorneys are unwilling to take on prisoner litigation. *See McCaa*, 893 F.3d at 1036 (Hamilton, J., concurring) (observing that many prisoner-filed cases are frivolous, while the remaining few "may be among the most important that federal courts consider").

Finally, it must be remembered that when the Court determines that recruitment of counsel is appropriate, it can take months to locate a willing lawyer. This delay works to the detriment of all parties and contravenes Congress' instruction in Federal Rule of Civil Procedure 1 that district courts must endeavor to secure the "just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1. Thus, looming large over each request for counsel are the Court's ever-more-limited time and resources.

With these considerations in mind, the Court returns to the question presented: whether counsel can and should be appointed to represent Plaintiff. First, the Court must determine whether the litigant has made "reasonable" efforts to obtain his own representation. *Pruitt,* 503 F.3d at 655; *Jackson v. Cty. of McLean*, 953 F.2d 1070, 1073 (7th Cir. 1992). It is a question not often litigated; many district judges either overlook arguably unreasonable efforts at obtaining counsel, or they impose eminently

practical requirements such as the submission of evidence demonstrating that the prisoner has tried and failed to secure representation from several lawyers. *See, e.g.*, *Kyle v. Feather*, No. 09–cv–90–bbc, 2009 WL 2474627, at *1 (W.D. Wis. Aug. 11, 2009).

Here, Plaintiff makes no attempt to show that he undertook any efforts to secure counsel on his own. Indeed, he simply assumes that the "reasonable attempts" element is met, as did the Court of Appeals, in reliance on his past efforts to contact a few attorneys. (Docket #97 at 10; Docket #95 at 6). But Plaintiff's case has developed substantially from its beginnings in February 2016. This includes the litigation and discovery efforts both on his part and by Defendants, as well as substantial judicial insight in the form of opinions from this Court and the Court of Appeals. Thus, it would be a very different undertaking for counsel to represent Plaintiff now as opposed to at the prior junctures when he contacted local lawyers seeking representation. Plaintiff has not shown that he made any renewed efforts to obtain counsel in light of these changed circumstances.

Allegations that reasonable attempts have been made to secure counsel are not a mere *pro forma* component of a motion for appointment of counsel. Instead, in order to ensure that the "reasonable attempts" element has any teeth, the Court must require that a prisoner offer evidence of reasonable efforts to obtain counsel *each and every time* he files a request for appointed counsel. Otherwise, a prisoner could seek counsel once at the beginning of a years-long case and claim thenceforth that "reasonable" efforts had been made. This approach is plainly unacceptable. While Plaintiff may lament that this would require substantial effort on his part, it is entirely consistent with the purpose of the reasonable-efforts

requirement. That is to ensure that if the Court and private lawyers must expend scarce resources to provide counsel for a prisoner, he has at least made a good-faith effort to avoid those costs by securing counsel himself.[2]

Notwithstanding his failure to exercise reasonable due diligence in obtaining his own lawyer, Plaintiff also fails to establish the second *Pruitt* element: that the difficulty of the case exceeds his capacity to coherently present it. This assessment must be made in light of the particular capabilities and circumstances presented by each *pro se* litigant. *James*, 889 F.3d at 326–27. The Court of Appeals explains:

> The second step is itself grounded in a two-fold inquiry into both the difficulty of the plaintiff's claims and the plaintiff's competence to litigate those claims himself. The inquiries are necessarily intertwined; the difficulty of the case is considered against the plaintiff's litigation capabilities, and those capabilities are examined in light of the challenges specific to the case at hand. Ultimately, the question is not whether a lawyer would present the case more effectively than the pro se plaintiff; if that were the test, district judges would be required to request counsel for every indigent litigant. Rather, the question is whether the difficulty of the case—factually and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself. Notably, this inquiry extends beyond the trial stage of the proceedings. The relevant concern is whether the plaintiff appears competent to litigate his own claims, given their degree of difficulty. This includes all of the tasks that

---

[2] Plaintiff further states that being unable to afford a lawyer means that he cannot be expected to seek counsel on his own. (Docket #97 at 10). But this is no different than the vast majority of plaintiffs who seek damages for alleged injuries. Almost none of them have the resources to pay an attorney at an hourly rate. That is why the majority of plaintiffs' attorneys work on a contingency basis. Simple poverty, then, cannot be a reason to excuse the requirement that reasonable efforts be made to secure counsel.

> normally attend litigation: evidence gathering, preparing and responding to motions and other court filings, and trial.

*Id.* (citations and quotations omitted). While courts need not address every concern raised in a motion for appointment of counsel, they must address "those that bear directly" on the individual's litigation capacity. *McCaa*, 893 F.3d at 1032.³

The balancing contemplated in the second *Pruitt* step must also incorporate the reality that district courts cannot be expected to recruit counsel in circumstances which are common to all or most prisoners. *See Bracey v. Grondin*, 712 F.3d 1012, 1017–18 (7th Cir. 2013); *Pruitt*, 503 F.3d 647, 656 (observing that the Seventh Circuit has "resisted laying down categorical rules regarding recruitment of counsel in particular types of cases"); *Harper v. Bolton*, 57 F. Supp. 3d 889, 893 (N.D. Ill. 2014). Doing so would place untenable burdens on court resources. It would also turn the discretion of Section 1915(e)(2) on its head, making appointment of counsel the rule rather than the exception.

Several pronouncements from the Court of Appeals appear to be in tension with the principle that a court need not appoint counsel in anything but an exceptional case. First, the Seventh Circuit has noted that "complexity increases and competence decreases as a case proceeds to the advanced phases of litigation." *James*, 889 F.3d at 327. It deems the

---

³The Court finds it more than ironic that when Plaintiff filed a motion for appointment of counsel in the Court of Appeals, the motion was denied cursorily without *any* analysis of Plaintiff's circumstances, *Randy McCaa v. Todd Hamilton, et al.*, Case No. 16-4209 (7th Cir.), (Docket #22), despite Plaintiff raising many of the same concerns about his litigation abilities that he presents to this Court, *id.*, (Docket #20). Counsel was later recruited for Plaintiff *sua sponte* after the appeal was fully briefed. *Id.*, (Docket #37).

"[a]dvanced phases" to include those from discovery onward. *Id.*; *McCaa*, 893 F.3d at 1032. But nearly every prisoner case proceeds to discovery, as the district court applies exceedingly lenient review during initial screening of cases under 28 U.S.C. § 1915A.

Second, *James* states that a prisoner's transfer away from a facility where the events of a lawsuit took place meaningfully inhibits his ability to collect relevant evidence. *James*, 889 F.3d at 327. Transfers happen regularly, however, outside the federal court's control and for reasons totally divorced from a prisoner's pending litigation. Moreover, while *James* recognizes that institution transfer does not automatically harm a particular inmate's ability to competently litigate, it offers few insights into which sorts of prisoners or which sorts of claims require physical proximity. *See id.*; *Thorton v. Godinez*, 720 F. App'x 762, 766 (7th Cir. 2017) (indicating that the prisoner must show that they made attempts to investigate their claims that were frustrated by the transfer).

Third, the Seventh Circuit instructs that district courts should evaluate a prisoner's competency irrespective of the involvement of a "jailhouse lawyer." *McCaa*, 893 F.3d at 1033; *Walker v. Price*, No. 17-1345, 2018 WL 3967298, at *5 (7th Cir. Aug. 20, 2018). How courts should do this is not clear. The Court rarely knows whether a filing was prepared by the plaintiff or someone helping him. And if the Court does know that the plaintiff is receiving help, how can it assess his ability to litigate without knowing which portions of the filings are his work, and which come from the jailhouse lawyer? In *Walker*, the court determined that the inmate's work product decreased in quality after his jailhouse lawyer was transferred to another prison. *Walker*, 2018 WL 3967298, at *6. Yet a savvy

prisoner, looking to secure counsel for himself, could do this on purpose, crafting his filings to downplay his own litigation capabilities. The Court would have no way to assess whether the inmate is indeed sandbagging.

Fourth, *James* instructs that cases involving "complex medical evidence" are better candidates for recruitment of counsel, not only to seek relevant evidence, but also to secure expert testimony. *James*, 889 F.3d at 328 (quotation omitted). While this is undoubtedly true on a theoretical level, such cases are also quite common. Many *pro se* prisoner complaints seek redress for long courses of allegedly improper medical treatment by many different providers. Even experienced district judges are ill-equipped to assess medical complexity, so it will be a rare day when the court can confidently say that a particular prisoner's medical claims are so straightforward that counsel appointment is unnecessary.

Finally, the Court of Appeals indicates that claims are particularly complex when they touch on the defendant's state of mind, such as with claims of deliberate indifference to prison conditions or medical needs. *James*, 889 F.3d at 327–28; *McCaa*, 893 F.3d at 1032. Yet a government official's culpable mental state is the foundation for most claims brought by prisoners. Indeed, it is often the defining characteristic that sets Section 1983 claims apart from their state-law tort analogues. Deliberate indifference to an inmate's rights is essential to nearly all claims of cruel and unusual punishment, excessive force, mistreatment of serious medical needs, and First Amendment and due process violations. *See Kingsley v. Henderson*, 135 S. Ct. 2466, 2473 (2015); *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Hambright v. Kemper*, 705 F. App'x 461, 462 (7th Cir. 2017); *Milton v. Slota*, 697 F. App'x 462, 464 (7th Cir. 2017)

("*[N]egligently* inflicted harm does not amount to a constitutional violation.") (emphasis in original). Taken together, these claims comprise the vast majority of prisoner litigation in this District. If state-of-mind issues are generally beyond the ability of most *pro se* litigants to establish, then counsel will likely need to be appointed in nearly every prisoner case. This is plainly impossible.

The guiding rule has always been that appointment of counsel is the exception rather than the rule in *pro se* prisoner litigation. Yet district courts have been instructed that a confluence of all-too-common circumstances—discovery, jailhouse lawyers, and claims concerning state of mind—militate in favor of the appointment of counsel. As the list of reasons to appoint counsel grows, the reasons not to do so shrink. This District's resources have not kept pace.

Against the totality of this backdrop, the Court finds that Plaintiff has not presented sufficient evidence or argument showing that he cannot litigate this matter competently on his own.[4] Plaintiff primarily focuses on how a lawyer would have been better able to manage this case and pursue his claims. First, Plaintiff says that this matter is, as the Court of Appeals puts it, in "a more sophisticated stage of litigation." *McCaa*, 893 F.3d at 1033. He argues that counsel would have helped him avoid the procedural errors he committed at the summary judgment phase and, more importantly, gather more evidence during the discovery phase. Second, Plaintiff has been confined throughout the case, limiting his ability to conduct normal

---

[4]Plaintiff seems to believe that the burden lies with Defendants to show that he is competent to litigate, otherwise counsel must be appointed. (Docket #105 at 16). This is false. The burden lies with Plaintiff alone to show his incompetence.

litigation activities. Third, Plaintiff was transferred away from the facility where the events of this case took place, making it even more difficult to locate material witnesses. Finally, Plaintiff echoes the Court of Appeals' observation that deliberate indifference claims can be complex and difficult to prove.

As discussed above, these issues are common to most every prisoner-filed case. Nearly every prisoner case proceeds past the screening stage and on to discovery and summary judgment. In the numerous cases in which dispositive motions are filed, prisoners must apply the straightforward rules of procedure to properly present their arguments to the court. The Court assisted Plaintiff in this regard, as it does with all prisoner litigants, by providing copies of the most pertinent federal and local procedural rules, as well as helpful *pro se* litigation guides. Plaintiff's position here is founded on his belief that a lawyer would do a better job than he. This is undoubtedly true, but the Seventh Circuit has rejected this as a reason for appointment of counsel. *Pruitt*, 503 F.3d at 655.

As to the fact of Plaintiff's confinement, this restriction applies by definition to almost all prisoner cases. Further, Plaintiff is still able to send and receive correspondence, make copies, write motions and briefs, and perform legal research. These are the common features of litigation. Short of simply freeing him from imprisonment, there is nothing more that can be done to facilitate Plaintiff's litigation efforts.[5] As to the transfer issue,

---

[5]Indeed, Plaintiff's release from imprisonment might hinder his litigation more than it helps. Unlike a non-prisoner *pro se* litigant, who is generally a member of society with common demands upon his time like work and family obligations, prisoners like Plaintiff have more than sufficient discretionary time to attend to their litigation tasks and develop their cases. Perhaps prison conditions are not

many inmates are transferred throughout the Wisconsin prison system without regard for their litigation activities. If a transfer-related difficulty in contacting witnesses could serve as a basis to appoint counsel, then a substantial percentage of prisoner litigants would be almost *per se* entitled to counsel.

The Court acknowledges that claims involving the alleged deliberate indifference of public officials can be complex. The most difficult task is establishing that the official was subjectively aware of the risk of harm to the plaintiff. *See Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). This can usually only be accomplished by marshalling circumstantial evidence. This evidence can be had, however. At the summary judgment stage, with the evidence construed in Plaintiff's favor, he has a more than negligible chance of raising a triable issue as to a defendant's state of mind. Whether counsel would be necessary to aid Plaintiff at a subsequent trial is not an issue before the Court. In this case, Plaintiff did not lose because of a lack of evidence, but because he chose not to abide by the applicable procedural rules.

The Court finds that this list of common hindrances to prisoner litigation, assessed separately or in concert, cannot support bestowing the ostensibly rare benefit of appointed counsel. Far more important to the Court is a consideration of how Plaintiff's work compares to that of other prisoner litigants. As the Court stated in denying his prior motions for appointment of counsel, Plaintiff appears to fully understand his case and he generally files clear, cogent motions (even if they are not always

---

ideal for that work, but the time Plaintiff has available to do the work should ease some of his burden.

meritorious). Plaintiff has also engaged extensively in the discovery process, though it has not been as fruitful as he may have hoped. Though his summary judgment submissions did not conform to the rules of procedure, they were otherwise far more coherent than the Court sees in other prisoner filings.

By far the best example of Plaintiff's litigation abilities is Plaintiff's briefing on this very motion. Plaintiff admits that his opening brief is largely copied from the appellate brief submitted by his counsel. The brief was nevertheless carefully edited to include more appropriate arguments and citations to evidence. *See* (Docket #97). The reply, by contrast, is almost entirely in Plaintiff's own words. (Docket #105). It is, without exaggeration, one of the best prisoner-prepared legal documents the Court has read in years. The reply offers incredibly detailed and considered arguments based on a careful assessment of Defendants' evidence and a marshalling of Plaintiff's own evidence. These recent filings demonstrate that Plaintiff is much better than his fellow prisoners at presenting his positions to the Court.[6]

---

[6]Another example is illuminative. Plaintiff claims to not know how to draft a motion to compel, but in his affidavit in support of his motion for appointment of counsel, he does precisely that. (Docket #98). Plaintiff lays out the discovery requests he submitted, Defendants' responses thereto, and argues why those responses are inadequate. *Id.* He attaches a set of exhibits to corroborate his argument, including his discovery requests, the materials produced by Defendants, and some correspondence he received from Defendants' counsel regarding discovery. (Docket #98-1). Defendants' response brief disputes Plaintiff's account of the parties' discovery exchanges. In his reply brief, Plaintiff carefully responds to each of Defendants' points, suggesting precisely how Defendants could have and should have done more to produce the information he desired. (Docket #105 at 11–15). Plaintiff's problems with discovery were not, then, his lack of sophistication or inability to understand the process, but rather the same

This view is not altered by an evaluation of Plaintiff's education, litigation skills, and mental health. *See Henderson v. Ghosh*, 755 F.3d 559, 565 (7th Cir. 2014); *Walker*, 2018 WL 3967298, at *5 (noting that courts should consider "any available evidence" of the prisoner's literacy, communication skills, education level, litigation experience, intellectual capacity, or psychological history). Plaintiff claimed throughout this case that he has a fifth-grade reading level, but he now concedes that he reads at a ninth-grade level and has obtained his GED. This education is, sadly, above that normally seen in prisoner litigants. Plaintiff further laments that he has no legal training and has relied on help from jailhouse lawyers. The absence of litigation skills is also not uncommon, but Plaintiff has filed prior lawsuits, giving him a slight edge on his fellow prisoners. As to help from a jailhouse lawyer, if Plaintiff's briefing on the instant motion is an example of his own writing and argumentative abilities, it is *he* who should offer his services as a legal aid.

Plaintiff insists that his mental health issues and suicidal ideations have hampered his litigation efforts. It is not clear precisely where and how these psychological concerns have affected Plaintiff's case. Further, Defendants have offered a psychologist's opinion indicating that Plaintiff is not as troubled as he suggests. Most disturbingly, there is evidence in the record that Plaintiff's mental health issues are fake, contrived by him so that he can achieve his own ends and harass correctional staff. While Plaintiff

---

problems that many litigants face: a disagreement with the opposing party about the scope of discovery. Plaintiff was fully capable of bringing his complaints about Defendants' discovery responses to the Court's attention during the discovery period in this matter, but he chose not to file a motion to that effect. He cannot lay blame for that choice on the non-appointment of counsel.

disputes the accuracy this evidence, this is not a motion for summary judgment, wherein the Court must construe the evidentiary material in Plaintiff's favor. Instead, the balance of the evidence leads the Court to find that the mental health issue does not weigh strongly in Plaintiff's favor.[7]

Rather, the evidence shows that even without counsel, Plaintiff could have done better in litigating this matter, and specifically in avoiding summary judgment by complying with the rules of procedure. None of the remaining considerations concerning Plaintiff's claims, his abilities, or his circumstances, whether considered separately or as a whole, convince the Court that counsel should be appointed to represent him. Indeed, Plaintiff's demonstrated abilities make him one of the very last prisoners for whom this Court would consider appointing counsel. The Court will, therefore, deny Plaintiff's fifth motion for appointment of counsel.

What now becomes of this case? The "law of the case" doctrine requires this Court "to confine its discussion to the issues remanded." *United States v. Morris*, 259 F.3d 894, 898 (7th Cir. 2001). Determining the scope of the issues remanded involves eliminating those issues that were waived or decided on appeal. *See United States v. Husband*, 312 F.3d 247, 250–51 (7th Cir. 2002). The Seventh Circuit has explicitly provided that a party waives those issues that could have been raised on appeal but were

---

[7]The Wisconsin Department of Justice's general practice is to not oppose a prisoner's request for appointed counsel. (Docket #100 at 1 n.1). This practice makes it difficult, if not impossible, to objectively assess an inmate's physical and mental limitations. The Court is usually left with no choice but to take an inmate at their word as to the existence and effect of any such limitations. As with the issue of inmate legal assistance, the inmate's temptation to exaggerate is great. The only reason the Court has any contrary evidence to consider in ruling on the instant motion is because it specifically ordered briefing from Defendants. *Id.*

not, and it has stated that those issues not raised on appeal are not remanded. *See United States v. Swanson*, 483 F.3d 509, 514 (7th Cir. 2007). In fact, the Seventh Circuit has often stated that a party cannot use remand as an opportunity to reopen claims that have been waived or decided. *See, e.g., Morris*, 259 F.3d at 898.

As explained above, Plaintiff's original appeal materials listed a number of issues for appeal beyond appointment of counsel, focusing on Plaintiff's disagreement with the substantive aspects of the Court's summary judgment decision. (Docket #89). However, once counsel was recruited for Plaintiff in the Court of Appeals, the only issued pursued in the parties' briefs was this Court's failure to appoint counsel. Reconsideration of counsel appointment was, in turn, the mandate issued to this Court. (Docket #95 at 12). That mandate has been addressed. Plaintiff did not raise, and has now waived, any other concerns about the disposition of this action, including any perceived errors in the Court's grant of summary judgment to Defendants. The Court will, therefore, reinstate its decision on summary judgment and again dismiss this action with prejudice.

Accordingly,

**IT IS ORDERED** that Plaintiff's fifth motion for appointment of counsel (Docket #97) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the Court's December 15, 2016 Order denying summary judgment to Plaintiff and granting summary judgment to Defendants (Docket #80) be and the same is hereby **REINSTATED**;

**IT IS FURTHER ORDERED** that the Court's September 2, 2016 (Docket #53) and December 15, 2016 (Docket #80) Orders denying Plaintiff's third and fourth motions for appointment of counsel be and the same are hereby **REINSTATED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 21st day of March, 2019.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge